## Staunton

## GERTRUDE WILLIAMS v. SERVICE INCORPORATED, ET AL.

September 6, 1957.

Record No. 4701.

Present, All the Justices.

The opinion states the case.

*Hale Collins* (*John T. Delaney*, on brief), for the plaintiff in error.

*R. B. Stephenson, Jr.* and *Wayt B. Timberlake, Jr.*, for the defendants in error.

Miller, J., delivered the opinion of the court.

Gertrude Williams, occupant of an automobile driven by Mamie Williams, was injured in an accident near the intersection of U. S. route 60 and State route 648 when the Williams car was in collision with a tractor-trailer truck owned by Service Incorporated and operated by Carol Temple Anderson. Gertrude Williams, hereinafter called plaintiff, sued Service, Anderson, and William B. McClinton, Jr., and charged that the collision was caused by Anderson's negligence and the negligence of McClinton in the operation of his car.

The jury found a verdict against Service and Anderson, but in favor of McClinton. Service and Anderson moved the court to set aside the verdict against them because it "was contrary to the law and the evidence and without evidence to support it." That motion was granted and judgment entered in favor of Service, Anderson, and McClinton.

The court found and stated in the final order "that the plaintiff's evidence is utterly incredible and in conflict with the established physical facts."

No appeal was sought against McClinton and the judgment in his favor is final.

Plaintiff asserts that the court erred:

(a) In overruling her motion for a default judgment against Service and Anderson, and

(b) When it set aside the verdict against Service and Anderson on the ground that it was contrary to the law and evidence.

Cross-error was assigned by Service and Anderson because the court refused to give instruction No. 1.

Plaintiff's motion for judgment was filed on May 14, 1955, and process promptly served upon all defendants. She alleged that the westbound car, in which she was seated, was negligently struck in the rear by the tractor-trailer going in the same direction shortly after McClinton negligently drove from an intersecting road and crossed in front of plaintiff's vehicle. In his grounds of defense McClinton denied negligence and alleged that the operation of his vehicle did not cause or contribute to the collision.

On June 2, 1955, Service and Anderson lodged a written motion for a bill of particulars in the clerk's office, a copy of which had been mailed to counsel for plaintiff on the previous day. The clerk marked this motion "filed June 2, 1955," but no court order was then entered requiring plaintiff to file a bill of particulars or extending the time for Service and Anderson to file responsive pleadings. Rules of Court 3:5, 3:7 and 3:18 (a) and (d). This motion requested no information about the accident but sought particulars as to the nature and extent of plaintiff's injuries and her resultant expenses and loss.

Plaintiff contended that the motion was not a *responsive pleading* as required by Rule of Court 3:5, and on October 26, 1955, she moved for a default judgment against Service and Anderson under Rule of Court 3:19. The court was, however, of opinion that the motion for a bill of particulars was a sufficient compliance with Rule of Court 3:5, and by order of October 26, 1955, overruled plaintiff's motion for a default judgment, and plaintiff excepted. By this order the court also required plaintiff to file a bill of particulars within fourteen days and allowed Service and Anderson fourteen days thereafter in which to file grounds of defense. Plaintiff filed particulars on November 9, 1955, Service and Anderson filed grounds of defense on November 14, 1955, and the case was tried on April 30, 1956.

A fair interpretation of Rule 3:5 requires a finding that a defendant is in default if, after service of the motion for judgment upon him, more than twenty-one days expire before he files his "pleadings in response." The phrase, "and if he fails to file a pleading he is in default," contemplates more than the mere filing of a motion for a bill of particulars in the clerk's office. Under Rule 3:18 "motions in writing" are declared to be "pleadings," but a motion for particulars is not within the category of "pleadings in response" as con-

templated in Rule 3:5. Burks, Pleading and Practice (4th ed.), § 185, p. 298.

The ultimate effect of the order of October 26, 1955, however, was to require a bill of particulars and grant Service and Anderson additional time in which to file grounds of defense. Allowance of such further time is in the sound discretion of the court (Rule of Court 3:13), and it does not appear that the extension of time in which to file grounds of defense prejudiced plaintiff. We find no merit in this assignment of error.

The accident occurred on June 8, 1954, at 5:15 p.m. east of the city of Covington, Virginia, on U. S. route 60, a short distance west of where that primary highway is intersected by State route 648. In this area route 60, a divided four-lane highway, extends approximately east and west and is 52 feet wide. Each lane is 12 feet wide, and the inner passing lanes are separated by a median grass-topped strip four feet wide, which has a concrete curb on each side.

Route 648, a secondary State road, intersects route 60 from the south but it does not cross the highway. The opening in the median strip in route 60 for the use of traffic coming from and going into route 648 is 40 feet wide. Eastwardly from the intersection route 60 is straight for approximately 1850 feet.

A plat introduced in evidence shows the distance from the intersection to objects and points on route 60 mentioned by witnesses and by reference to which they undertook to state the location and movement of the motor vehicles involved in the accident and the distances the vehicles were apart at different times. This plat discloses that the western end of a bridge 65 feet long on route 60 over Pounding Mill Run is 273.5 feet east of the intersection. The center lines of the entrance and exit respectively of a drive-in theatre on the northern side of route 60 are distant 583.5 feet and 429.5 feet eastwardly from the intersection. The center line of the Silver Arrow restaurant on the south side of route 60 is 895.5 feet east of the intersection.

Prior to the accident it had rained, and the roads were still damp in places, but drying. East of the intersection, route 60 is level, but at the intersection a grade of about four per cent begins, and this degree of elevation continues for some distance westwardly.

The tractor-trailer was 44 feet, 9 inches, long, the trailer being 32 feet in length. Then unloaded, its over-all weight was about 22,000

pounds, and air brakes with which it was equipped applied to the tractor wheels, as well as to those of the trailer.

Mamie Williams testified that when she was slightly east of the drive-in theatre and driving westwardly along route 60 toward the intersection, she saw McClinton's car slowly approaching along route 648 and nearing route 60. She then looked in her rear view mirror and saw the tractor-trailer which was to her rear coming toward her around the curve east of the theatre. At that time she was slightly east of the theatre and she then turned into the westbound passing lane near the entrance of the theatre, driving at 45 to 50 miles an hour, and continued in that lane at the same speed. When about at the bridge over Pounding Mill Run, she again looked in her rear view mirror and saw the tractor-trailer close to the entrance of the theatre, and it was then going from the right lane into the westbound passing lane, which would put it in the lane behind her vehicle, and it steadily gained on her. She says that McClinton's car entered route 60 when she was at the bridge, crossed the intersection going slowly, and that car completed its left turn into the north westbound lane of route 60 before she reached the intersection, and its movement did not interfere with her. She proceeded westwardly in the passing lane on through the intersection, and when she then looked in her rear view mirror, the truck was "very close," and when she looked ahead "just for a second, it seemed to me," the truck hit the rear of her car. She was then abreast and passing the McClinton car, which was in the north lane.

On cross examination she was asked how far the truck was behind her "as she approached the bridge."

"A. Well, it was—he had come quite a little bit—well, the distance between the bridge—I was at the bridge and he was about back where the entrance to the Drive-In Theatre is.

      *      *      *      *      *      *      *

"Q. And when you say very close behind you, what do you mean, Mrs. Williams?

"A. Well, he was as close as from here across over there to that building (indicating) or maybe a little closer.

"Q. He was still, though, approximately as far as from where you are to the building across the street—the church building?

"A. No; I didn't say the church building. I said from me direct to that building yonder across the street (indicating).

"Q. Oh, the building right beside the church building—the gray building that you are looking at out of the window there; is that right (indicating)?

"A. Yes; something like that, or he may have been slightly closer.

\*     \*     \*     \*     \*     \*     \*

"Q. And when you say close to you, you have reference to a distance approximately as far as from where you are sitting to the gray building across the street (indicating); is that right?

"A. Something like that."

After the collision the Williams car went out of control, crossed the median strip and stopped in a ditch on the south side of route 60 about 180 feet west of the western line of the intersection.

Plaintiff testified that she does not drive a motor vehicle; and was not paying much attention to the highway, but their car entered the passing lane "along in front of the Drive-In Theatre." The only time she saw the tractor-trailer was when she looked back before their car had passed the intersection. It was then in the westbound passing lane "coming in real close," and before she could fully turn to the front, it struck their car from the rear. She further said that their car had been in the westbound passing lane from down near the theatre and was in the passing lane beside another westbound car when struck. On cross-examination she testified that when she looked back and saw the tractor-trailer, it was "fairly close" behind them. Asked what she meant by "fairly close," her answer was, "Well, I don't know; I'd say it was about the length of this court room, maybe a little closer."

Defendant, McClinton, testified that as he approached route 60, he saw the Williams car coming around the curve east of the Silver Arrow restaurant; he proceeded on up to the intersection, stopped, and then drove slowly into route 60 and across the intersection in low gear at approximately fifteen miles an hour, and turned left into the north westbound lane. He says that he had completed his turn and had proceeded westwardly in that lane "about 70 steps," and the Williams car had come up in the passing lane abreast of and was passing him when he heard the noise of the collision. He pulled off the highway, stopped his car, and walked to where the Williams car had come to rest.

Parker Wright, a witness on behalf of Service and Anderson, tes-

tified that he talked with Mamie Williams after the accident while she was lying on the ground and asked her what happened, and she replied that the colored fellow pulled out in front of her. In her testimony Mamie Williams said that she was not conscious for a time after the accident, in which her legs were broken and she sustained scalp wounds, and she denied having any such conversation with Wright.

State Trooper Crush said that shortly after the accident McClinton stated that he stopped on route 648 before entering the highway, and "the cars" were then on the bridge over Pounding Mill Run "as he started across the road," and that he had or thought he had time to cross before they got to the intersection. Crush also testified that skid marks from the tractor-trailer began in the passing lane in the middle of the intersection and continued in a southwesterly course for 84 feet. It appeared from marks left by the tractor-trailer that its left wheels were against the northern curb of the median strip from a point four feet west of the western line of the intersection until those wheels mounted the curb. From the western end of the 84-foot skid mark, there was a distance of 33 feet without skid marks to the rear of the tractor-trailer, which stopped with its left wheels on the median strip. No marks attributable to the Williams car were found on the hard surface of route 60, and the exact point of impact was not made apparent from physical evidence.

The trooper's examination of the Williams green car and the tractor-trailer disclosed that "there was light green paint on the right end of the front bumper" of the tractor "and the left rear fender" of the Williams car was damaged; "it was scraped from the rear up the side of the fender to about the rear wheel * * *." When Trooper Crush was asked to describe the marks or damage to the fender of the Williams car, he answered as follows:

"A. The marks tightened up—in other words, it got tighter against the fender and cracked the fender. In other words, it cut a hole in the fender but it didn't go completely to the front of the fender.

"Q. Then I take it that there was a definite hole in the left rear fender of the Williams car?

"A. Yes, sir.

* * * * * * *

"A. The fender was scraped from the rear up to near the front of

the rear wheel (indicating) and this dark mark (indicating) is where some object had cut the fender as though it tightened up against the fender and cut a hole in it."

Anderson testified that when he rounded the turn east of the intersection, he was driving between 40 and 45 miles an hour in the passing line, and there were one or two westbound cars in the north lane, and the "last vehicle ahead of him" was the Williams car. He intended to pass the Williams car, but was not sure that he blew his horn to signal his intention. He was overtaking it from the bridge and had come up approximately abreast of it at the intersection. After crossing the bridge, he saw the McClinton car on route 648 and that vehicle did not fully stop but "paused momentarily" before entering route 60 when the tractor-trailer was approximately 200 feet east of the intersection. Anderson says that he then let up in his speed but did not fully apply his brakes for he feared that his vehicle might "jack-knife." McClinton had completed his left turn into the north westbound lane when, without warning, and while all the cars involved were in the intersection, Mamie Williams, in attempting to pass the McClinton car, "applied her brakes" and "cut over" from the north lane into the passing lane and hooked her rear fender on the right side of the tractor's bumper. He further testified that he was then traveling about 35 miles an hour, and he locked his brakes and turned his vehicle to the left, skidded along the median strip curb until he released his brakes; the left wheels mounted the median strip, and the vehicle continued on some distance.

Evelyn Hontz testified she was driving westwardly at about 30 to 35 miles an hour following the tractor-trailer in the passing lane, and before it reached the intersection, she saw the rear trailer lights start "flashing a red stop sign * * *," but she did not see the Williams car until after the collision when it was against the bank. She saw McClinton's car as it approached route 60 but did not know whether it stopped because the tractor-trailer prevented her from seeing it as it came to and entered route 60, but she did see that car when it crossed the highway and parked on the north side of route 60 a short distance from the intersection.

During the trial the jury was taken to view the scene of the accident.

Plaintiff insists that the evidence is sufficient to establish that the McClinton car crossed the intersection and proceeded westwardly before she, while in the passing lane, entered the intersection and

that the tractor-trailer was negligently driven into her car from the rear after she had crossed the intersection. On the other hand, Service and Anderson contend that McClinton entered the intersection and turned westwardly when the tractor-trailer was in the passing lane approaching the intersection, and the Williams car in the north lane; that to avoid McClinton's car, Anderson properly applied his brakes, but Mamie Williams, in attempting to pass McClinton's car turned from the outer lane to the left against the bumper of the tractor, and thus caused the mishap. Service and Anderson insist that the collision could not have taken place as claimed by plaintiff because the various distances stated by her witnesses to exist between the vehicles at times by reference to objects and points on the highway render it impossible for the truck to have gained so rapidly upon the Williams car as to strike it just after it passed the intersection and that the distance estimates testified to by her witnesses and the physical marks upon the two vehicles conclusively disprove her verbal testimony and that of her witnesses. In short, Service and Anderson insist that evidence relied upon by plaintiff to sustain the verdict is incredible, and the verdict was contrary to the evidence.

All conflicts in the evidence and all reasonable inferences from the evidence have been resolved in plaintiff's favor by the jury's verdict, and we must view the evidence in the light most favorable to her. It must also be remembered that it was Mamie Williams and not the plaintiff who testified in detail as to the distance that the tractor was behind the Williams car as the vehicles approached and passed different objects or places on the highway. Plaintiff saw the tractor-trailer only once and said that it was then coming up "real close."

Among others, the following decisions are cited by Service and Anderson to sustain the principle of law relied upon and to justify its application to the evidence.

"* * * Though the case be heard as upon a demurrer to the evidence, the court will not stultify itself by allowing a verdict to stand, although there may be evidence tending to support it, when the physical facts demonstrate such evidence to be untrue and the verdict to be unjust and unsupported in law and in fact." *Norfolk & Western Railway Co.* v. *Strickler*, 118 Va. 153, 155, 86 S. E. 824.

"* * * While, broadly speaking, credibility is a question for the jury, the rule is subject to the exception that the courts are not required to believe the incredible. * * *" *Burch* v. *Grace Street Building Corp.*, 168 Va. 329, 339, 191 S. E. 672. *Norfolk & Western*

*Railway Co.* v. *Hardy*, 152 Va. 783, 148 S. E. 839; *Virginia Electric & Power Co.* v. *Mercer*, 161 Va. 666, 171 S. E. 495.

We have no quarrel with the principle of law relied upon, but it must be remembered that neither plaintiff nor her witnesses attempted to give fixed and certain distances that the vehicles were from named objects, or apart as they moved at varying speeds toward the intersection, and to the immediate point of collision.

"Unless the testimony of the litigant shows clearly and unequivocally that he has no case, or where fair-minded men may differ as to the effect of his testimony, the litigant is not concluded thereby. * * *" *Crew* v. *Nelson*, 188 Va. 108, 114, 49 S. E. 2d 326.

"* * * However, for a litigant to be barred from recovery because his testimony is irreconcilable or at variance with physical facts or other certain proof, it must have been unequivocal and upon matter within his knowledge and so conclusively in conflict with other proved facts as to leave no room for difference of opinion between reasonable men.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"It is to be remembered that Taylor was rendered unconscious by the collision. When his testimony, which does not undertake to give specific distances and locations, is tested by the above principles, it does not clearly and unequivocally appear that he has no case against Clayton.

"The right of the jury to interpret and weigh the testimony of a witness is entitled to wide latitude. It is primarily their province to measure and evaluate the factual meaning of the testimony of all witnesses, and unless it clearly appears that they have erred by abusing or transcending the wide scope of their authority as reasonable men, their findings of fact should not be disturbed. They saw and heard Taylor testify. What he intended and meant by the distances and locations given were matters that they were peculiarly fitted to pass upon." *Clayton* v. *Taylor*, 193 Va. 555, 561, 562, 69 S. E. 2d 424.

The facts testified to unequivocally by Mamie Williams and by plaintiff are that they proceeded for a considerable distance in the passing lane with the tractor-trailer rapidly gaining until it struck their car from the rear after they had negotiated the intersection. This testimony is strengthened by that of McClinton and Hontz, for from the testimony of those two witnesses it may also be found that

the Williams car was in the passing lane followed by the tractor-trailer for some considerable distance before it reached the intersection and that McClinton negotiated the intersection without interfering with their progress. Their testimony corroborates much of Mamie Williams' testimony and tends to contradict Anderson and to show that the Williams car did not turn suddenly to the left against the bumper of the tractor, but was struck from behind by that vehicle.

The evidence relied upon by plaintiff cannot be held incredible and the issue of whether or not Anderson was guilty of negligence that was a promixate cause of the collision was a question for the jury to determine.

■ Instruction No. 1 tendered by Service and Anderson, and refused, follows:

"The Court instructs the jury that if Carol Anderson, as he approached the intersection of Route 60 with the Mallow Road [route 648], was free of negligence in the operation of his truck and that he was confronted by a sudden emergency arising from the negligence of William D. McClinton, Jr. in entering Route 60 in the path of Anderson's truck, and was compelled to act instantly in an effort to avoid a collision, he cannot be held liable simply because he did not make the wisest choice in seeking to avoid the danger."

When this instruction was offered, no objection was made to its form by plaintiff or McClinton, but they asserted that the evidence was insufficient to prove that Anderson was confronted with a sudden emergency and that if he was, he did nothing to avoid it.

In her motion for judgment plaintiff charged that McClinton "negligently, carelessly and recklessly" made a left turn into the north westbound lane in front of Mamie Williams. Anderson's testimony tended to prove that allegation, and if believed by the jury, it was sufficient to support a finding that Anderson was exercising reasonable care, but as McClinton's car turned into the north lane, it came in dangerous proximity to the Williams car and caused that vehicle to turn suddenly to the left and into the path of the tractor-trailer, and thus caused an emergency.

"We have frequently had occasion to discuss the doctrine of sudden emergency, and have repeatedly held that where the driver of an automobile, without prior negligence on his part, is confronted with a sudden emergency, and acts as an ordinarily prudent person would have done under the same or similar circumstances, he is not guilty

of negligence." *Daniels* v. *Whitten Transfer Co.*, 196 Va. 537, 545, 84 S. E. 2d 528.

The evidence was sufficient to support an instruction upon the question of whether or not Anderson was confronted with an emergency. Refusal to instruct upon that principle was prejudicial, and for the reasons stated the judgment will be reversed and a new trial awarded.

*Reversed and remanded.*